Andrew S. Friedman (State Bar No. 005425)
afriedman@bffb.com
**BONNETT FAIRBOURN FRIEDMAN & BALINT, P.C.**
2325 E. Camelback Road, Suite 300
Phoenix, Arizona 85016
Telephone:   (602) 274-1100
Facsimile:    (602) 274-1199

*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| Bill McCauley; and Edward D. Kendler, sole trustee of the Kendler Family Trust, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>Jahm J. Najafi and Cheryl Najafi, husband and wife; Kevin M. Weiss and Elizabeth S. Weiss, husband and wife; David P. Franke and Stephanie M. Rankin Franke, husband and wife; James D. Staudohar and Kathleen M. Staudohar, husband and wife; Scott Wiley and Gail E. Wiley, husband and wife,<br><br>Defendants. | No. 2:16-cv-03461-SPL<br><br>**FIRST AMENDED COMPLAINT**<br><br>***Jury Trial Demanded*** |

### Introduction

1.      Plaintiffs Bill McCauley and Edward D. Kendler (collectively, Plaintiffs) bring this action for violations of the Arizona Securities Act on behalf of themselves individually and a class of other similarly situated persons who both purchased and held the publicly traded, unrestricted stock of Xhibit Corp. (Xhibit) between May 16, 2013 and September 10, 2014 (the Proposed Class Period).[1]

2.      Xhibit and Defendants Najafi, Weiss, Franke, and Staudohar orchestrated a fraudulent or deceitful transaction, practice, and course of business in connection with a May 16, 2013 merger transaction between Xhibit and SkyMall[2] (the Merger). Through the Merger scheme, Xhibit and Defendants created a materially fraudulent and deceptive public market for SkyMall—an insolvent, previously private company with a history of operating losses.

3.      Xhibit and Defendants Najafi, Weiss, Franke, and Staudohar failed to disclose SkyMall's dire financial condition at the time of the Merger, concealing its financial statements while deceptively attributing a value to SkyMall of over $25 million.

4.      When the Merger was announced on May 17, 2013, Defendant Najafi publicly represented in a PR Newswire press release that the Merger would strengthen Xhibit and position it for continued growth:

> Xhibit is a leading marketer and their industry expertise will give SkyMall a strong competitive advantage.  This merger positions the combined company properly for continued growth both domestically and internationally.

Similarly, Defendant Weiss represented in the same press release:

> SkyMall and Xhibit are a perfect match of innovation, marketing and technology.  This merger enables SkyMall with significant opportunities to create heightened value for our partners and customers.  With the help of Xhibit's team, we look forward to expanding our industry-leading platforms around the world.

---

[1] Xhibit shares are not covered securities traded on a national securities exchange within the meaning of 15 U.S.C.A. § 77p(f)(3).

[2] "SkyMall" and "the SkyMall Companies" means, collectively, SkyMall, LLC and SkyMall Ventures, LLC and their corporate predecessors SkyMall Holdings Corporation, SkyMall, Inc. and SkyMall Ventures, Inc.

5.      These statements were part of a larger scheme, in which the speakers intentionally omitted and concealed the true purpose of the Merger and the poor financial condition of SkyMall. Contrary to the quoted statements, Najafi and Weiss did not intend to grow or expand the value of either SkyMall or Xhibit.  In reality, Najafi intended from the start to phase out Xhibit's pre-merger business lines and to use the Merger as the platform for a scheme to pay debt to his affiliates by taking SkyMall public, terminating Xhibit's business lines, and selling the loyalty segment of SkyMall's business, which was SkyMall's only profitable business line. Thus, the Merger was a deceptive transaction and practice that furthered Najafi's financial interests while operating as a fraud on Plaintiffs and other public investors.

6.      Xhibit and Defendants Najafi, Weiss, Franke, Staudohar, and Wiley thereafter perpetuated the scheme by deceptively inflating the value of Xhibit after the Merger, specifically through SEC filings described below, overstating Xhibit's assets and net worth by tens of millions of dollars and deceptively understating Xhibit's operating expenses by hundreds of millions of dollars, while delaying disclosure of the truth until after Xhibit's loyalty business was sold and Najafi's affiliated companies were paid.

7.      In furtherance of the ongoing scheme Najafi completed the sale of Xhibit's loyalty segment on September 9, 2014.  By then, all of Xhibit's pre-merger business lines had been terminated and SkyMall's business outside the loyalty line was unprofitable. Over 60% of the proceeds from the sale of the loyalty segment were used to repay insider debt to Najafi affiliates.  Xhibit was forced to file bankruptcy four months later.

8.      After written inquiries by the Securities and Exchange Commission (SEC), Xhibit's Audit Committee formed a Special Investigative Committee to investigate the facts surrounding the Merger. The Special Investigative Committee retained the Jones Day law firm to assist it in conducting the investigation.

9.      As a result of the investigation conducted by the Special Investigative Committee and Jones Day, Defendants were ultimately forced to acknowledge the deceptive nature of the Merger by taking an impairment charge of over $137 million.

Xhibit and Defendants did not reveal the need for this massive restatement, however, until they filed an overdue 2013 SEC Form 10-K on September 10, 2014, effectively admitting therein that, between the date of the Merger and the corrective disclosure of September 10, 2014 (that is, the Proposed Class Period), Xhibit's reported assets and net worth had been overstated by tens of millions of dollars and its operating expenses had been understated by hundreds of millions of dollars.

10.     On October 21, 2014, Xhibit in its SEC Form 10-Q revealed that the SEC's Division of Enforcement notified Xhibit that it was investigating the Merger and related events. The investigation includes Defendant Najafi's role in inducing the Merger and his subsequent sale of Xhibit securities to reap personal profits, including his activities as a controlling person and director of Xhibit.

11.     On January 22, 2015, Xhibit filed for bankruptcy, effectively rendering Xhibit's stock worthless.

12.     Plaintiffs accordingly bring this action seeking rescission or rescissionary damages on behalf of themselves and on behalf of a putative class of similarly situated investors (the Proposed Class) who bought and held unrestricted shares of Xhibit stock during the Proposed Class Period.

**Jurisdiction and Parties**

**A.     Jurisdiction**

13.     Defendants have removed this action to federal court pursuant to the Class Action Fairness Act ("CAFA"), 28 U.S.C. §1332(d). Plaintiffs are presently conducting limited discovery to ascertain whether the Court has subject matter jurisdiction over this case under CAFA or, alternatively, whether there are grounds for the Court to exercise its discretion to remand this action to the Arizona Superior Court.

**B.     Venue**

14.     Venue in this Court is proper assuming it has subject matter jurisdiction.

**C.     Plaintiffs**

15.     Plaintiff Bill McCauley is a resident, domiciliary and citizen of Tennessee.

3

16.     Attached as Exhibit A is a schedule showing Plaintiff McCauley's purchases and sales of Xhibit stock during the Proposed Class Period (i.e., from May 16, 2013, through September 10, 2014).

17.     Plaintiff Ed Kendler is a resident, domiciliary and citizen of Arizona, and the sole trustee of the revocable trust known as the Kendler Family Trust.

18.     Attached as Exhibit B is a schedule showing Plaintiff Kendler's purchases and sales of Xhibit stock during the Proposed Class Period (i.e., from May 16, 2013, through September 10, 2014).

**D.     Defendants**

19.     Defendant Jahm J. Najafi (Najafi) is a resident, domiciliary, and citizen of Arizona. At all material times, Najafi was married to Cheryl Najafi and acted on behalf of his marital community with his wife.

20.     Najafi was a controlling person and member of Xhibit's board of directors from June 18, 2013 to October 29, 2014.

21.     Defendant Kevin Weiss (Weiss) is a resident, domiciliary, and citizen of Arizona. At all material times, Weiss was married to Elizabeth S. Weiss and acted on behalf of his marital community with his wife.

22.     Weiss was a controlling person and member of Xhibit's board of directors from May 16, 2013 to November 13, 2014.

23.     Defendant David P. Franke (Franke) is a resident, domiciliary, and citizen of Arizona. At all material times, Franke was married to Stephanie M. Rankin Franke and acted on behalf of his marital community with his wife.

24.     Franke was a controlling person and member of Xhibit's board of directors from April 18, 2013 to 2015.

25.     Defendant James D. Staudohar (Staudohar) is a resident, domiciliary, and citizen of Arizona.  At all material times, Staudohar was married to Kathleen M. Staudohar and acted on behalf of his marital community with his wife.

26.     Staudohar was a controlling person and member of Xhibit's board of

directors from March 25, 2013 to February 4, 2015.  Staudohar was also a member of Xhibit's audit committee.

27.     Defendant Scott Wiley (Wiley) is a resident, domiciliary, and citizen of Arizona. At all material times, Wiley was married to Gail E. Wiley and acted on behalf of his marital community with his wife.

28.     Wiley is a CPA who was Xhibit's CFO from September 11, 2013 to November 16, 2014, when he replaced Weiss as acting CEO.  Wiley was a controlling person of Xhibit until its bankruptcy in January 2015.

**E.     Relevant Non-Parties**

29.     Xhibit was a publicly traded Nevada corporation with its primary place of business in Arizona.  On or about January 22, 2015, Xhibit filed a petition for bankruptcy relief under Chapter 11 of the Bankruptcy Code in matter 2:15-bk-00680-BKM (D. Ariz.).

30.     SkyMall LLC was a Delaware limited liability corporation with its primary place of business in Arizona. On or about January 22, 2015, SkyMall LLC filed a petition for bankruptcy relief under Chapter 11 of the Bankruptcy Code in matter 2:15-bk-00679-BKM (D. Ariz.).

**F.     Xhibit's Arizona base of operations.**

31.     Throughout the Proposed Class Period Xhibit and the individual Defendants used Arizona as their base of operations to induce brokers and market makers to solicit investments from Plaintiffs and other public investors.

32.     Xhibit and the individual Defendants' Arizona-based activities include the following non-ministerial acts taken in Arizona:

- Xhibit and the SkyMall Companies were all Arizona-based companies that negotiated, signed and consummated the Merger in Arizona.

- Xhibit and the SkyMall Companies each had their principal place of business and corporate headquarters in Arizona.

- Each of the Defendant officers and directors—Najafi, Weiss, Franke, Staudohar, and Wiley—conducted business, operated from, and resided in Arizona.

- Xhibit's board of directors' meetings were conducted in Arizona.

- Xhibit's SEC filings including the SEC Form 10-Ks, 10-Qs, and 8-Ks described in this Complaint were drafted, approved by Xhibit's management, and signed by Xhibit's officers in Arizona.

- Xhibit's press releases (including the May 17, 2013 press release quoted above) and other public statements regarding the Merger and post-Merger events were prepared in Arizona and emanated from Arizona.

- The Merger's closing occurred in Phoenix, Arizona.

- Except with respect to the effect of the Merger (to which Delaware law applies), the Merger agreement was governed by Arizona law.

- The conduct comprising the fraudulent and deceitful transactions, practices and course of business alleged herein occurred primarily within Arizona.

## Factual Allegations

### A.   Najafi's Acquisition and Control of SkyMall

33.   In 2012 SkyMall operated a specialty-retail business offering an array of merchandise from direct marketers and manufacturers through the SkyMall catalog and website (SkyMall.com), and a loyalty business as a provider of merchandise, gift cards, and experiential rewards reaching millions of loyalty-program members in corporate and other loyalty programs throughout the United States. At the time, SkyMall was a privately owned company.

34.   As of December 31, 2011, SkyMall's audited financial statements reported assets of $44,360,115, liabilities of $73,425,396, an accumulated deficit (loss) of $29,065,281, and a net loss for FY 2011 of $17,106,411.

35.   On or about April 4, 2012, affiliated companies controlled by Najafi acquired SkyMall for approximately $10 million. As a result, Najafi gained control, directly or indirectly, of SkyMall.

36.   Najafi realized, however, that SkyMall was losing millions of dollars and could stay in business only so long as he or his affiliated companies provided credit to cover its operating losses.

37.    As of December 31, 2012, SkyMall's audited financial statements reported assets of $51,109,385, liabilities of $55,943,477, an accumulated deficit (loss) of $40,172,660, and a net loss for FY 2012 of $1,993,194.  Notably, in SkyMall's 2012 audited financials the value attributed to SkyMall's intangible assets, tradename, and goodwill was only $9.7 million, an amount far lower than the inflated numbers later reported in Xhibit's deceptive SEC filings after the Merger.[3]  Because SkyMall at the time was a privately owned company, its audited financial statements were neither disclosed nor available to the investing public.

38.    As of March 31, 2013, SkyMall's interim financial statements reported assets of $53,962,093, liabilities of $60,913,347, a working-capital deficit of $21,770,341, an accumulated deficit (loss) of $40,172,660, and an operating loss of $2,117,162.

39.    In short, prior to the Merger SkyMall had a negative net worth, a history of operating losses and deficits, and was in jeopardy as a going concern.  SkyMall's ability to stay in business was made possible only by credit and related debt provided through Najafi and his affiliated companies as part of the deceptive practices, transactions, and course of business alleged herein.

**B.    Najafi Merges SkyMall with Xhibit**

40.    Xhibit operated as a cloud-based marketing and technology company focused on digital advertising, mobile and social media development, and customer relationship management solutions.

41.    In June 2012, Xhibit went public through a reverse takeover of an existing public company.

42.    Xhibit in 2012 relocated and established its corporate offices in Tempe, Arizona.

43.    On April 16, 2013, Xhibit in its SEC Form 10-K for 2012 reported a positive net worth as of December 31, 2012, of only $3.024 million.

---

[3] SkyMall's 2012 financials also reflect a working-capital deficit of $19,368,173 ($55,943,477 (current liabilities) minus $36,575,304 (current assets) = $19,368,173).

44.     In Spring 2013, Najafi met with Xhibit's management and proposed a merger between SkyMall and Xhibit. In his discussions with Xhibit's management, Najafi described SkyMall as an asset-rich company with excess available cash that could provide liquidity for Xhibit's business segments. Najafi presented the Merger to Xhibit's management as a way for SkyMall and Xhibit to join their businesses and mutually strengthen one another.

45.     As noted above, prior to the Merger SkyMall actually had a negative net worth, a working-capital deficit, and had lost over $2 million in the first quarter of 2013. SkyMall was able to report net income in FY 2012 only through a debt restructuring in which credit-line debt, bank fees, and other debt-related expenses totaling $11.595 million were forgiven and reported as a non-operating gain that increased income. SkyMall's audited financial statements should have included a going-concern qualification and were materially deceptive and misleading because they did not.

46.     Najafi nevertheless valued SkyMall as worth $25.5 million for purposes of the Merger (i.e., $75,358,670 less $49,858,670 in assumed liabilities = $25,500,000), failing to disclose that SkyMall in fact had a negative net worth and was plagued by heavy debt, operating losses, illiquidity and other undisclosed adverse financial results.

47.     Defendants Weiss, Franke, and Staudohar agreed with Najafi to use his $25.5 million SkyMall valuation for purposes of the Merger scheme, even though they too knew that SkyMall in fact had a negative net worth.

48.     The Merger Agreement was publicly filed as part of an SEC Form 8-K filing on May 22, 2013.  Although SkyMall's audited financial statements for 2011 and 2012 (and its unaudited financial statements for the first quarter of 2013) were an exhibit to the signed Merger Agreement, Defendants *omitted* the SkyMall financial statements

(and the material information they included regarding SkyMall's negative net worth and deficits) from the copy of the Merger Agreement included in Xhibit's Form 8-K filing.[4]

49.    Failure to disclose SkyMall's negative net worth and deficits (as well as its 2013 operating loss) when Najafi and Weiss announced the Merger in the press release quoted in paragraph 4 was materially misleading.  Any reasonable investor would have wanted to know that the Merger that was supposed to position Xhibit for "continued growth" and "to create heightened value" involved a company (SkyMall) that had a negative net worth and had been losing millions of dollars.

50.    The inflated valuation of SkyMall's net worth for purposes of the Merger was a material part of Defendants' fraudulent or deceitful transactions, practices, and course of business.

**C.    Najafi Assumes Control of Xhibit**

51.    Once SkyMall merged with Xhibit in May 2013, Najafi became the beneficial owner of a majority of Xhibit shares.

52.    On May 16, 2013, Najafi selected his associate Weiss, who was formerly SkyMall's CEO, to replace Xhibit's existing CEO.  Weiss was also named to Xhibit's Board of Directors.

53.    On June 18, 2013, Najafi himself became a member of Xhibit's Board of Directors.

54.    After solidifying his control of Xhibit, Najafi began implementing his plan to dismantle Xhibit's pre-merger business lines.

55.    Xhibit had two business lines.  One line was nutraceutical products.  The other was internet marketing.  Xhibit's profits and most of its non-SkyMall revenue came from nutraceutical sales.  Despite the profitability of the nutraceutical sales line, Najafi and Weiss terminated it just after the Merger.

---

[4] SkyMall and Najafi instead buried SkyMall's financial statements in an amendment (Xhibit Form 8-K/A) that was not filed until August 1, 2013, more than 60 days after the Merger.

56.    With the termination of the nutraceutical line, Xhibit's only non-SkyMall business was its internet-marketing segment.   Najafi and Weiss reduced funding for internet marketing and by December 2013 (seven months after the Merger) they had shut down the technology-development component of the internet-marketing segment; and by June 2014 they suspended the remainder of the internet-marketing segment.   After that, Xhibit's only remaining business was SkyMall.

57.    Despite knowledge that Xhibit's only pre-Merger profitable business segment (nutraceutical sales) had been terminated, and despite knowledge of SkyMall's true operating losses, negative net worth, and accumulated deficits (losses), Najafi and the other Defendants failed to take steps to correct the materially deceptive valuation of SkyMall at $25.5 million, instead engaging in a transaction, practice, and course of business that operated as a fraud or deceit on Plaintiffs and other public investors.

58.    Specifically, Defendants Najafi and Weiss, in concert with Franke and Staudohar, on August 19, 2013, filed a SEC Form 10-Q for the period ended June 30, 2013, in which they deceptively reported that the acquisition of SkyMall had increased Xhibit's net worth from $3.024 million as of December 31, 2012 to $25.640 million as of June 30, 2013. In Xhibit's second-quarter 2013 SEC Form 10-Q, the value Defendants attributed to Xhibit's intangible assets, tradename, and goodwill was $42.5 million even though Xhibit reported only $2,597,748 in net intangibles (including goodwill) in its March 31, 2013 financials and SkyMall reported only $9,679,096 in net intangibles (including goodwill) in its March 31, 2013 financials.   In short, the second-quarter 10-Q deceptively overvalued Xhibit's intangibles and goodwill by millions of dollars.

59.    Defendants' inflated valuation of Xhibit's net worth in the SEC Form 10-Q for the period ended June 30, 2013, was a material part of their fraudulent or deceitful transactions, practices, and course of business.   In addition, representing that SkyMall had a value of $25.5 million without disclosing that SkyMall had a negative net worth and had been losing millions of dollars at the time of the Merger was a materially misleading omission.

60.     In their 10-Q for the second quarter of 2013, Defendants jointly formulated and represented that they had adopted a three-part plan to overcome Xhibit's financial difficulties. The 10-Q (at 7) describes the plan as follows:

> A multi-step plan was adopted by management to enable the Company to continue to operate and begin to report operating profits. The highlights of that plan are:
>
> - The Company plans to seek additional debt and/or equity financing.
>
> - The Company intends to more fully integrate the operations of Xhibit and SkyMall to gain better efficiencies.
>
> - The Company plans to aggressively seek new and additional sales opportunities.

These representations regarding the plan were materially misleading because Defendants failed to disclose that (a) they were in the process of eliminating Xhibit's business lines rather than attempting to integrate the operations of Xhibit and SkyMall and (b) Najafi intended to use his control of Xhibit to sell SkyMall's loyalty segment, which was SkyMall's only profitable business line.

61.     In September 2013, Najafi further solidified his control of Xhibit by using a Najafi affiliate (X Shares, LLC) to purchase 15 million additional Xhibit shares from Xhibit's former CEO at the below market price of $375,000 (2.5¢ per share). Later, just before the delayed SEC Form 10-K for FY 2013 was filed, Najafi would sell 14.6 million of the shares for a profit of over $8 million.

62.     In September 2013, at Najafi's direction former SkyMall CFO Wiley became Xhibit's CFO. Wiley assisted in preparing and certifying Xhibit's subsequent SEC filings.

**D.     Defendants Continue the Scheme and Delay Disclosure**

63.     On November 15, 2013, Defendants filed an SEC Form 10-Q for the period ended September 30, 2013, in which Defendants Najafi, Weiss, Franke, and Wiley reported Xhibit's net worth as $19.12 million and falsely represented its year-to-date operating loss as only $12.5 million. The 10-Q was signed by Xhibit's CFO Wiley, a

certified public accountant.

64.     Approximately a year later, on September 10, 2014, Defendants Najafi, Weiss, Franke, and Wiley amended the third quarter 2013 SEC Form 10-Q to show that the actual operating loss was $34 million (more than double) the $12.5 million previously reported. The earlier, misleading Form 10-Q that was filed on September 30, 2013 was a material part of Defendants' fraudulent or deceitful transactions, practices, and course of business.

65.     In their 10-Q for the third quarter of 2013, Defendants again jointly formulated and represented that they had adopted a multi-part plan to overcome Xhibit's financial difficulties.  The 10-Q (at 7) describes the plan as follows:

> A multi-step plan was adopted by management to enable the Company to continue to operate and begin to report operating profits.  The highlights of that plan are:
>
> - Elimination of unprofitable business units and product offerings.
> - Integration of the heritage Xhibit and SkyMall operations to gain better efficiencies.
> - Aggressively seek new and additional sales opportunities.
> - Improve product gross margins through product sourcing efficiencies.

These representations regarding the plan were materially misleading because Defendants failed to disclose that (a) they were in the process of eliminating Xhibit's business lines rather than attempting to integrate the operations of Xhibit and SkyMall and (b) Najafi intended to use his control of Xhibit to sell SkyMall's loyalty segment, which was SkyMall's only profitable business line.

66.     Although Xhibit's SEC Form 10-K for FY 2013 was due in April 2014, Defendants delayed filing it.  Defendants' delay in filing the Form 10-K for FY 2013 was likewise a material part of their fraudulent or deceitful transactions, practices, and course of business.

67.     In the interim, rather than disclose the truth about SkyMall's financial

condition, Defendants publicly assured investors, brokers, and market makers that Xhibit was actually worth millions *more* than the value reported at the time of the Merger.

68.     For example, on April 16, 2014, Defendants Najafi, Weiss, Franke, Staudohar, and Wiley purported to reassess SkyMall's value at the time of the Merger. Defendants on that date jointly authorized and approved Xhibit's filing of an SEC Form 8-K.  The April 16, 2014 8-K reported that Xhibit (a) had reassessed the Merger's value and (b) had concluded that the Merger's net value was actually ***over $150 million more than what had been originally reported***.  The Form 8-K was signed by Xhibit CFO Wiley.

69.     According to the April 16, 2014 SEC Form 8-K, Xhibit concluded that the Merger should have been valued on the basis of the market price of Xhibit's stock at the time of the Merger.  On that basis, Defendants through Xhibit's Form 8-K reported that the net fair value of the Merger was $177.76 million, rather than $25.5 million.

70.     In the same April 16, 2014 SEC Form 8-K Defendants indicated that Xhibit's SEC Form 10-K for 2013 would be delayed based on a reassessment of the fair value of SkyMall used in connection with the Merger, but deceptively stated that "we do not believe the restatement will cause any changes to the previously reported cash, debt, revenues, cost of revenues, or gross profit amounts" for previously reported periods (the Previously Reported Line Items).

71.     The statement regarding the Previously Reported Line Items was deceptive because Najafi and the other Defendants by April 16, 2014, failed to disclose that the reassessed value was materially undermined by (a) SkyMall's undisclosed pre-merger financial statements (showing a negative net worth of nearly $5 million, an operating loss, and a working-capital deficit) and (b) Xhibit's post-merger operating history (showing millions of dollars in losses).  In addition, the statement was materially misleading because it selectively references accounts that would be unchanged while omitting material changes that would be expected in other accounts including (1) the non-current asset account, (2) the additional-paid-in-capital account, and (3) the non-cash-based-compensation expense account.

72.     Defendants' filing of the deceptive SEC Form 8-K on April 16, 2014, including the deceptive overstatement of SkyMall's value in the Merger, the deceptive understatement of Xhibit's operating losses and the deceptive assertion regarding the Previously Reported Line Items, was a material part of their fraudulent or deceitful transactions, practices, and course of business.

73.     On May 9, 2014, Defendants filed an SEC Form 8-K in which they reported that the reason for the delayed SEC Form 10-K for FY 2013 related to SEC comment letters on its 2013 periodic reports.  In that regard, Najafi deceptively failed to disclose that he was deliberately delaying filing the Form 10-K for FY 2013 until after he completed the sale of Xhibit's loyalty business.

**E.      Revelation of the Truth**

74.     As a material part of the scheme, Xhibit and Defendants deliberately delayed disclosure of known facts concerning its nature and effect. Although due on April 1, 2014, Xhibit and Defendants did not in fact file Xhibit's Form 10-K for FY 2013 until September 10, 2014.

75.     In Xhibit's delayed SEC Form 10-K for FY 2013, Xhibit and Defendants once again changed the reported accounting for the Merger, this time based upon the investigation of the Special Investigative Committee and the Jones Day law firm.  Xhibit and Defendants now conceded that the fair value of the Xhibit shares issued to SkyMall's shareholders should have been used to value the Merger. Under the reassessment, an additional $125.596 million in consideration was recorded. In the 2013 Form 10-K, an impairment charge was reported as an operating expense that reduced Xhibit's net income for FY 2013 to a loss of $172.202 million.  Moreover, Xhibit and Defendants now reported Xhibit's corrected net worth at only $10.2 million as of December 31, 2013.

76.     Xhibit and Defendants on September 10, 2014, also disclosed for the first time the sale of SkyMall's loyalty business (SkyMall Ventures, the only performing segment of its business) for $24 million, more than $15 million of which went to pay off Najafi affiliates who had extended credit to SkyMall.

77.     On October 29, 2014, Najafi resigned as an Xhibit director, and abandoned Xhibit.

78.     On November 13, 2014, Weiss resigned as Xhibit's CEO.

79.     On January 22, 2015, Xhibit and SkyMall LLC both filed bankruptcy petitions.

80.     On August 26, 2015, the bankruptcy court entered its order confirming a joint plan of liquidation under Chapter 11 of the Bankruptcy Code for both Xhibit and SkyMall.

**F.     No Good Faith Defense**

81.     Defendants Najafi, Weiss, Franke, and Staudohar had a business background in finance and understood financial statements. Najafi was CEO of a private-equity firm with a Master's degree in business and economics from Harvard, and a B.A. in economics and development studies from the University of California, Berkley.  Weiss is a Princeton graduate who had been SkyMall's CEO before becoming Xhibit's CEO. He had over 30 years' experience in senior management at a variety of technology and software companies before becoming Xhibit's CEO.  Franke held an MBA from ASU and was the principal of a private-equity firm. Staudohar was experienced as a CPA and Chief Financial Officers of numerous companies and held a degree in accounting.  He was a member of Xhibit's Audit Committee.[5]

82.     Prior to the Merger, Defendants Najafi, Weiss, Franke, and Staudohar received copies of both SkyMall and Xhibit's financial statements. From reading Xhibit and SkyMall's pre-Merger financial statements, Najafi, Weiss, Franke, and Staudohar knew that the effect of merging Xhibit with SkyMall was to render Xhibit insolvent. After the Merger, Xhibit's consolidated financial statements showed a negative net worth, an operating loss, and a working-capital deficit.  Despite Xhibit's insolvency and with reckless disregard for the truth about Xhibit's financial condition, these Defendants each

---

[5] Defendants' background is set forth in the Xhibit 2013 SEC Form 10-K, at 52-53.

agreed to value SkyMall at $25.5 million in the Merger.

83.     Wiley was SkyMall's former CFO, who became Xhibit's CFO in September 2013. Because of his previous position at SkyMall, Wiley was familiar with SkyMall's pre-merger and post-merger financial condition.  After becoming Xhibit's CFO, Wiley signed the deceptive Form 10-Q filed in September 2013 and the deceptive Form 8-K filed in April 2014.

**G.     Tender**

84.     Individually and on behalf of the members of the Proposed Class, Plaintiffs tender to Defendants all consideration received in connection with the securities that Plaintiffs purchased, and offer to do any other acts necessary for rescission under the common law or A.R.S. § 44-2001(A).  In return, Plaintiffs demand rescission with interest and attorney fees as provided in A.R.S. § 44-2001(A). Alternatively, Plaintiffs and the Proposed Class seek rescissionary damages.

**The Proposed Plaintiff Class**

85.     Plaintiffs bring this action on behalf of themselves individually and the following Proposed Class:

> All persons who purchased and held unrestricted Xhibit stock
> between May 16, 2013 and September 10, 2014.

Excluded from the Proposed Class are: (a) Defendants and (b) members of their families, their estates, any entity in which they have a controlling interest or which is a parent, subsidiary, or affiliate of or is or was controlled by them, and their officers, directors, managers, employees, affiliates, agents, legal representatives, heirs, predecessors, successors, and assigns.

86.     The members of the Proposed Class are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties, the Proposed Class members, and the Court.

87.     There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the

Proposed Class that predominate over questions that may affect only individual members of the Proposed Class include:

- whether the Defendants are primarily liable for violations of the Arizona Securities Act;

- whether Defendants are secondarily liable for violations of the Arizona Securities Act;

- whether Defendants may invoke any statutory defense to liability under the Arizona Securities Act;

- whether Plaintiffs and the other members of the Proposed Class are entitled to rescission; and

- whether Plaintiffs and the other members of the Proposed Class are alternatively entitled to rescissionary damages.

88.     Plaintiffs' claims are typical of those of the other members of the Proposed Class.   Plaintiffs will adequately protect the interests of the Proposed Class members. Plaintiffs have retained competent counsel to represent the Proposed Class.   Plaintiffs' legal counsel is experienced in class-action securities litigation.   Plaintiffs have no interest that conflicts with those of the other members of the Proposed Class.

89.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## Legal Causes of Action

### Count One
### (Primary Statutory Liability under A.R.S. §§ 44-1991(A)(2) and (A)(3))

90.     Plaintiffs incorporate the preceding allegations.

91.     Xhibit's stock constitutes a security under Arizona law.

92.     Defendants jointly engaged in the unlawful sale of securities to Plaintiffs and other members of the Proposed Class in violation of A.R.S. §§ 44-1991(A)(2) and (A)(3).

93.     Defendants violated A.R.S. § 44-1991(A)(2) by making materially false omissions regarding the Merger's value, the value of SkyMall's goodwill and intangibles, and SkyMall's net worth and operating losses.  *See* ¶¶ 45-46, 57-59.

94.     Defendants also violated A.R.S. § 44-1991(A)(2) by failing to disclose facts

regarding SkyMall's multi-million-dollar losses and negative net worth (¶¶ 37-38) and their intent to terminate Xhibit's pre-Merger business lines and to sell SkyMall's loyalty business.  Nondisclosure of these facts rendered misleading the statements in Defendants' press release announcing the Merger and in later SEC filings regarding Xhibit's business plans.  *See* ¶¶ 4-5, 60, and 65.

95.    In addition, Defendants violated § 44-1991(A)(2) through the omissions and selective statements in Xhibit's April 16, 2014 SEC Form 8-K as described in ¶¶ 70-72.

96.    Defendants violated A.R.S. § 44-1991(A)(3) by engaging in a transaction, practice, or course of business that operated as a fraud or deceit, inducing the unlawful sale of securities to Plaintiffs and the other members of the Proposed Class within the meaning of A.R.S.§ 44-2003(A).

97.    Defendants' scheme encompassed misconduct beyond the particular misrepresentations or omissions alleged above -- including the Merger itself, Najafi's course of conduct in terminating Xhibit's business lines, the delay in filing the SEC Form 10-K for FY 2013 and Form 8-K for 3Q 2013 and the undisclosed negotiations for the sale of Xhibit's loyalty business -- to essentially obtain public funding to pay off SkyMall's debt to Najafi affiliates.

98.    Scienter is not an element of Plaintiffs' A.R.S. §§ 44-1991(A)(2) and (A)(3) claims.[6]

99.    Reliance is not an element of Plaintiffs' A.R.S. §§ 44-1991(A)(2) and (A)(3) claims.[7]

100.    Loss causation is not an element of Plaintiffs' A.R.S. §§ 44-1991(A)(2) and (A)(3) claims for rescission or rescissionary damages.[8]

101.    Under A.R.S. § 44-2003(A) Defendants are jointly and severally liable for

---

[6] *Facciola v. Greenburg Traurig, LLP*, 2011 WL 2268950, at *3 (D. Ariz. June 9, 2011).

[7] *Facciola v. Greenburg Traurig, LLP*, 281 F.R.D. 363, 371 (D. Ariz. 2012).

[8] *Grand v. Nacchio*, 214 Ariz. 9, 24-25, 147 P.3d 763, 778-79 (Ct. App. 2006); *Hirsch v. Ariz. Corp. Comm'n*, 237 Ariz. 456, 462 ¶ 21, 352 P.3d 925, 931 ¶ 21 (Ct. App. 2015).

the unlawful scheme in violation of A.R.S. § 44-1991(A)(3).  Except for its bankruptcy, Xhibit would also be jointly and severally liable under A.R.S. § 44-2003(A)(3).

102.   Under A.R.S. § 44-2001(A), Defendants are liable for rescission or rescissionary damages as to the alleged violations of A.R.S. § 44-1991(A)(3), plus costs, attorney fees, and pre- and post-judgment interest.

## Count Two
### (Statutory Control Liability Under A.R.S. § 44-1999(B))

103.   Plaintiffs incorporate the preceding allegations.

104.   As alleged in Count One, Xhibit committed violations of A.R.S. §§ 44-1991(A)(2) and (A)(3) for which, absent its bankruptcy, it would be primarily liable under A.R.S. § 44-2003(A).

105.   Individually or as a group, Defendants controlled or had the power to directly or indirectly control Xhibit within the meaning of A.R.S. § 44-1999(B) when Xhibit's violations of § 44-1991(A) occurred.  As statutory controlling persons under A.R.S. § 44-1999(B), Defendants are jointly and severally liable for Xhibit's violations of § 44-1991(A).

106.   Accordingly, under this Count Defendants are liable as statutory control persons for rescission for the Count One violations of §§ 44-1991(A)(2) and (A)(3), plus costs, attorney fees, and pre- and post-judgment interest.

## **Demand for Relief**

Therefore, Plaintiffs demand judgment against Defendants jointly and severally, on behalf of themselves and the other members of the Proposed Class, for:

A.     rescission (or rescissionary damages);

B.     costs and attorneys' fees;

C.     pre- and post-judgment interest; and

E.     such other and further relief needed to provide Plaintiffs and the other members of the Proposed Class with a complete remedy.

19

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## **Demand for Jury Trial**

Plaintiffs demand a trial by jury on all issues so triable.

Dated: November 30, 2016.

BONNETT FAIRBOURN FRIEDMAN & BALINT, P.C.

By:*/s/Andrew S. Friedman*
      Andrew S. Friedman
      afriedman@bffb.com
      2325 E. Camelback Rd., Suite 300
      Phoenix, AZ 85016
      Telephone: (602) 274-1100
      Facsimile:  (602) 274-1199

      *Attorneys for Plaintiffs*

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## **CERTIFICATE OF SERVICE**

I hereby certify that a true copy of the foregoing document filed through the ECF system on November 30, 2016 will be electronically sent to the registered participants as identified on the Notice of Electronic Filing and paper copies will be sent to any non-registered participants.

Dated: November 30, 2016.

<div style="margin-left:40%">

*/s/Trish Aquilino*
An Employee of Bonnett Fairbourn
Friedman & Balint, PC

</div>